## FRANK HANDLEY v. STATE.

No. A-9508.  Nov. 29, 1939.
(96 P. 2d 546.)

J. Q. A. Harrod and Laynie W. Harrod, both of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

DAVENPORT, J.  Frank Handley was by information charged jointly with Charles Handley in the district court of Canadian county with the crime of maintaining a public nuisance, having been heretofore convicted for one or more violations of the prohibition law and served a sentence; was tried separately, convicted, and sentenced by the court to serve a term of three years in the state

penitentiary, and pay a fine of $1,000. From the judgment and sentence, the defendant Frank Handley appeals.

When the case was called for trial and the appearances noted, the defendant Frank Handley, by his attorneys, advised the court that he had filed a motion to suppress the evidence heretofore filed in this case, and desired to present the same to the court. The court examined the motion; without taking any testimony, so far as this record shows, overruled the same, and exceptions were saved. The case then proceeded to trial.

W. N. Fariss, called on behalf of the state, testified in substance as follows:

"My name is W. N. Fariss. I live at 1115 West Wade, El Reno, Oklahoma. I am acquainted with the defendant Frank Handley. He lives on lots 1 to 8 inclusive, block 5 of Riley's addition to the city of El Reno. His residence and location is approximately four blocks east of the Rock Island tracks on Foreman street. It is on Foreman street and two blocks north on Donald street in the City of El Reno, Oklahoma. I have been out to the defendant's place within the last twelve months prior to the 12th day of August, 1937. I have been to his residence on several occasions. By the State: Q. What was the purpose? By Mr. Harrod: We object to the purpose of his going out there as being incompetent, irrelevant, and immaterial. By the Court: Overruled. By Mr. Harrod: Exception. A. For the purpose of searching the premises for liquor. Q. Did you find any liquor on these premises, Mr. Fariss? By Mr. Harrod: Now, we object to it unless the time is fixed. By Mr. Roberson: Q. Well, within the last twelve months, or one year, since the 12th day of October, 1936?"

This was objected to by the defendant's attorney unless he fixed the date within a month or so.

"By the Court: Overruled. By Mr. Harrod: Exception. A. Well, the first time has been farther back than 12 months. It must have been at least two years ago.

The last time I was out there was August 12, 1937. Q. All right, what if anything did you find there at that time?"

Defendant objected on the ground that the officers were not armed with a valid search warrant to search the home or residence of this defendant on the 12th day of August, 1937.

"By the Court: Where is the search warrant? By Mr. Harrod: I don't know; I haven't seen it. By the Court: Overruled. A. We found four bottles of gin."

The witness continued:

"Roy Pool and Dan Hahn were with me, two jailors. That gin was placed in the record room at the county jail. It was wrapped in brown paper with a string tied around it four times, laying on the washing machine in the bathroom. That four bottles of gin was all that we found at the defendant's residence on the 12th day of August, 1937. I found a board of some character with the list of names of various kinds of whisky."

This was objected to; objection overruled; and exception saved.

"The board was hanging on the wall. I had been to the defendant's home about 30 days prior to the time, but I didn't find any liquor. I also went out there some time in the latter part of the winter."

This was objected to on the ground that it did not fix the time.

"By the Court: State the time as near as you can, Mr. Fariss. A. Well, it seems to me that it was in January, or I believe that I am wrong about that; I think that was in 1936—and in the early winter along about December, that we found about one hundred and fifty-six or sixty pints of liquor under the floor; I don't recall the exact quantity. Q. In other words, you found that, if I understand you correctly, as being just before last Christmas? A. That's right."

The witness stated: "I am not sure just what date."

A motion was made to strike the testimony as being too remote and was overruled and exception saved.

"The whisky was found underneath the floor of the dining room."

This was objected to by Mr. Harrod on the grounds that the defendant has already been tried and convicted, and alleges and pleads his conviction in its entirety.

The objection was overruled.

The witness continued:

"This liquor was found underneath the floor of the dining room, pretty well towards the center of the building itself, which was found by raising about four or five boards to locate it, so that a man could crawl down under the building; and the liquor was in bundles, and was brought from under the floor in bundles. Q. Do you recall if there was one kind of liquor, or liquor of different kinds?"

An objection was interposed, overruled, and exceptions.

"A. No, there were various brands of whisky found. That was in the room about the last of December, 1936. Q. Now, did you ever search the place and find liquor there any other time, or see liquor there? A. Approximately two months before when the large amount was found, I had occasion to search the place twice in one day—."

Mr. Harrod objected to that as being incompetent, irrelevant, and immaterial, and as being too remote, and not tending to prove or disprove any fact in this case. It was overruled, and exception taken.

"The liquor was thrown in the toilet stool and broken both times in one day. It was warm weather when I saw the whisky that had been broken in the toilet. Q. I will

ask you to examine State's Exhibit '1'. What is that Mr. Fariss, if you know? A. That is the wholesale price list of liquor. I found it hanging on the wall in Mr. Handley's home on the 12th day of August, 1937."

This board was introduced in evidence over the objections of defendant. The objection was overruled; and the defendant excepted.

"The defendant lived in Canadian county at the time this search was made."

On cross-examination witness Fariss stated that Mr. Handley had lived at the place the witness had described about two years. "I was deputy sheriff all this time. I found whisky there one time under the floor about a year ago."

The witness did not give the exact date.

"On August 12, 1937, I found four pints of gin in the washing machine in the bathroom. It was on top of the washing machine. There was nothing laying over the four pints. It was wrapped in a brown paper. I don't recall seeing a bathtub; I don't think there is one in the room. There is a toilet stool. It is a little room off of the kitchen. Mr. Handley was not there when I got there. He came later. Frank Handley the defendant, his wife, and several children lived at the home I have described. That is the only home that the defendant has in Canadian county so far as I know. We did not find any empty bottles around his place. We found no other bottles or containers indicating that they had held whisky, except the four bottles that I have mentioned. These bottles had not been opened. The things we usually find around a moonshine and bootlegging joint were not found there. There were no drunks around the place; nor was there any one there drinking. The wife of the defendant and a grown daughter were there at home when we went there. I don't know where the other children were. Charlie was the first one to arrive; and he came very shortly thereafter. I couldn't say positively whether Mrs. Handley was talking to Charlie or to Frank. I thought she said, 'Charles,' and called him by

name. I was in the room when she called. The defendant said that he did not know the gin was in the place; and I couldn't say as I found any evidence tending to prove that he did know it was there. I was right behind Mr. Hahn when Mr. Hahn picked it off the washing machine. The four pints of gin is the only whisky we found in this search. I think Mr. Pool looked under the floor. One time I was there some whisky had been poured into the toilet. I don't know the amount of whisky that was poured in the toilet, but we picked up the necks of the bottles. The defendant was there the last time during the day that this occurred. That was about a year ago now. One time the officers bought a pint off of Charlie."

Dan Hahn, testifying for the state, stated that he was jailor of Canadian county, and worked under the sheriff, John Harrison, on the 12th day of August, 1937.

"I, in company with the others, went to the residence of the defendant Frank Handley. We found four pints of gin. The original search warrant should be in the court. I served a copy of the search warrant on Frank Handley's daughter the day they searched the home. I didn't make a return, but Mr. Fariss did. Mr. Fariss, Roy Pool, and myself went down to the defendant's home. I had a search warrant in my possession, and I know the search warrant was delivered to some one in the home, and at the time we entered the home. Frank Handley the defendant was not present. The gin was on a washing machine in a little room off the kitchen."

On cross-examination the witness stated that he did not personally get the search warrant.

"I cannot say what court issued the search warrant. I cannot say where it is now; but the original should be filed in whichever court it was got out of. I can't remember what court issued it. I can't remember that far back. The warrant was not served on the defendant. The wife was there at home; but I served it on Irene, his daughter. I think that is the name. I served it on the first one that I could find. I think she was a minor. I have been to his

place where he was living on the 12th day of August, 1937, four or five times. The time we found this gin was the only time I found anything. These four bottles of gin were on the washing machine wrapped up in paper. Frank Handley was not at home when we got there. I afterwards talked to him, and he said he did not know anything about the gin being there. We did not find any empty bottles around the place that had recently contained whisky. We didn't find anything further outside of that board that had prices and things on it."

The witness then examined the board, and stated that he could not tell how long the prices written on the board had been there, and that he did not know in whose handwriting it was.

"At the time we looked under the floor, I could see two or three bottles that had been broken. The necks were still there, and the seals weren't broken. I don't remember if I saw any other part of the bottles. When I went to serve the search warrant, Mrs. Handley was in one of the back rooms in bed. Irene, I believe it was Irene, was at the front door. I believe it was one of his older daughters. She must be 16 or 17 years of age."

On redirect examination the witness stated:

"I gave the search warrant to the first person I saw, and that was his daughter. I didn't see any other person at that time. I don't know whether Mrs. Handley was sick in bed or not. She was in the bedroom. There are several gins listed on the board."

On re-cross-examination:

"I don't think Mrs. Handley was in bed. We found the gin in the west little room, north of the kitchen. We knew before we went to the house who lived at the house; and we knew it was the defendant's and Mrs. Handley's home. We knew the girl to whom I delivered a copy of the search warrant was his minor child."

John Harrison, the sheriff, was called and stated that his name was John Harrison.

"I am the sheriff of Canadian county. I know where the defendant Handley has been living for the past two or three years. It was located on lots 1 to 8 inclusive, in block .........., Riley's addition to the city of El Reno. I was out there on one of the parties, and searched the place sometime the latter part of last year or the early part of this year. We had a search warrant. We found quite a quantity of liquor out there. The liquor was under the floor of the house. One of Mr. Handley's boys showed us the place where they got under the floor. There was a space cut out of the floor. Underneath the floor was open. I wasn't with the other boys when they were over there in August, 1937."

On cross-examination:

"I believe that Frank has been living at his present address for about two years. During that time my officers have raided the place several times. One time we found the big volume that I spoke of, of 257 pints. The time I mention is the only time I have ever been with the officers when they found whisky. There hasn't any of the immediate neighbors out there near where Handley lives complained that Handley was carrying on a big bootlegging joint, and that divers people were congregating there and buying and drinking whisky. I have not had any complaints directly about Frank Handley's residence out there in the Riley addition. I have had a lot of complaints indirectly, which has been the cause of these raids that we have made out there."

Elvin Portwood:

"My name is Elvin Portwood. I am 27 years of age. I know Billie Laird, and Tom Boardman. I was with them sometime last July over at Fair addition to the home of the defendant. The other boys' names were Tom Boardman, Billie Laird, and Lorenzen. The boys wanted me to get some whisky, was the occasion of our going over there. I don't know how old the boys are. They are 18 or 20 years. I think they are high school boys. I don't know Billie Laird very well. We got some liquor. I don't know where the defendant Handley lives now. We went to 419 North

Donald. Frank Handley lived there where we got the liquor. I think Mrs. Handley was there at the time. There was quite a few of the family there. We got a pint of whisky. Paid $1.50 for it, and took it away from there. The liquor was delivered to me at the home of Frank Handley."

Defendant moved to strike the testimony for the reason that it was incompetent, irrelevant, and immaterial, and prejudicial, and did not tend to prove or disprove any issue in the case.

"Q. You didn't buy it from Frank Handley, did you? A. No, I don't know who I got it from; I don't remember."

On redirect examination: "I have been over to get liquor just that one time."

Re-cross-examination:

"These boys that were with me did not go in the house, and I am of age. I am twenty-seven years old."

Redirect examination: "I am working now at the Bake-rite Bakery."

Mr. C. C. Crabbe stated he lived at Oklahoma City.

"I am an investigator for the state of Oklahoma in the State Criminal Bureau. I was in El Reno on November 28, 1936. I know where the defendant Handley lives. I went over there first by myself. I called a taxi and drove over to Mr. Handley's place for the purpose of going to buy some whisky. I bought a pint of whisky, which I gave $2.50 for, and then waited, and the other officers came. When Mr. Jack Roberts, Mr. Elliott, and Mr. Fariss came, the place was raided then, and a pint of sloe gin was found on young Mr. Handley who was known as Choe Handley, and he was taken to jail that same night. The other persons present at the Handley home, at the time of the raid were Irene Handley, Clara Handley, daughters of Frank Handley, Mrs. Handley, and Mintor later came in during the raid, B. R. Mintor. B. R. Mintor was

the first one, a private party at El Reno, and Joe Ousley who drove up there, and Mrs. Laurene who lives at 517 Hadden Street, El Reno, or Hadden Avenue, and five boys ranging from the ages of 17 to 20 who came up to this place for the purpose of buying liquor, supposedly. By Mr. Harrod: Object to that. By the Court: Sustained as to the last statement. I saw some boys outside. They came up in a car. Frank Handley wasn't there, and I didn't buy any whisky off of him. We didn't find any whisky, but we found one pint of gin on the person of Choe Handley. Q. Now, wasn't it on the person of another fellow there? A. Sir? I took it off of Choe. I bought the whisky from Choe. There wasn't any of the people out there drinking. One of them was a little drunk; he tried to have a fight. This was Cliff Pryor of El Reno. None of the rest of them were drunk. We made no arrests of any one there for being drunk. We did not go out in the back yard, and we did not seen any empty bottles scattered around the place; nor did we see any empty bottles that had recently contained whisky. If we found any glasses around where people had been drinking, I did not make any record of it. Q. Well, did you? A. I don't remember. Q. Well, if you had, you would have made a record of it, wouldn't you? A. No, sir. Q. How? A. No, sir. Q. Of whisky glasses? A. No, sir. Q. That recently contained whisky? A. No, sir."

W. C. Elliott, testifying for the state, stated:

"My name is W. C. Elliott. I live in Oklahoma City. I am with the police department. I was working a year ago for the State Bureau of Investigation, and was over to El Reno sometime during the month of November, 1936, in company with Mr. Crabbe. I know where I was told that Frank Handley lived. Jack Roberts and Officer Crabbe rode out with me. Q. What did you find? By Mr. Harrod: Now we object to this as being irrelevant, incompetent, and immaterial, and prejudicial, and too remote. By the Court: Overruled. By Mr. Harrod. Exception. A. We found, well, I didn't find the liquor; but Roberts found a pint of sloe gin. Q. All right, you say there was a car with five boys come up? A. Yes, sir."

On cross-examination by Mr. Harrod:

"That was the first time that I was ever to the home of Frank Handley; I don't know Frank Handley, and he wasn't at home that day. I don't know, except I got the information from the county court that we went to the home of Frank Handley that night. It was merely hearsay as to whether or not I went to Frank Handley's home. I have never been back out there since that time. I didn't look for any bottles, and I didn't see any. I don't recall having seen any whisky glasses. We didn't find anything there that I could bring to the jury to show that there was whisky being served there in the way of glasses or utensils in which they served whisky."

Tom Boardman testified that Thomas J. Boardman was his name.

"I am 16 years of age. I am a sophomore in school. I know Billie Laird and Raymond Lorenzen, and also Portwood. I was in company with these parties in a cab or a car that was driven by Elvin Portwood sometime last fall. We got in the cab at the cab office, and went some place in Fair addition. Q. Who lived there? A. I don't know who it was. Q. Well, did you ever go with Portwood at any other time to that place? A. Yes, sir, that is, three of us or four of us went. That occasion was the only day. We got a bottle of liquor. Q. And who paid for that liquor? By Mr. Harrod: We object to that for the reason that it is irrelevant, incompetent, and immaterial. By the Court: Overruled. By Mr. Harrod: Exception. I gave 'Porky' the money, and he went in to whoever it was, and he got the liquor, and he came out with it; and we sat in the car. It was a pint. We paid $1.50 for it. It was not delivered to me. It was brought back to the cab for us."

Cross-examination by Mr. Harrod:

"Q. Do you know when that was? A. No, I don't; I believe it was three weeks before Christmas, I believe it was, or it was two weeks or something like that. Q. What year? A. 1936. I don't know where we went, and I

didn't see anybody buy any whisky, and I didn't buy any whisky from Mr. Handley. All I know is that I gave Eldon Portwood, who testified here, $1.50; and he gave me the bottle of whisky.

Harry Palmer, testifying for the state, stated:

"My name is Harry Palmer. I live at 244 North Donald in the city of El Reno. I work in the produce house in El Reno. I have been working there for six years. I live possibly about two blocks from where Frank Handley now lives, and has lived for a year or two. The defendant lives straight north from me. He lives on Donald. I have been living there since April of last year, and he was living there when I moved there. Q. Mr. Palmer, I wish you would state what you know concerning Frank, or, people going and coming to what is known as or what is and has been the residence of the defendant Frank Handley from a year ago last May, during the time you have lived there?"

This was objected to as incompetent, irrelevant, and immaterial.

"By the Court: Well, it seems to me that your question ought to be or have particular reference to the time charged in your information. By Mr. Roberson: I was trying not to be leading. By the Court: All right, let him answer the question. By Mr. Harrod: Exception. A. Well there was a lot of drinking up there. Q. Up where, now? A. On going north from that corner, that goes north, whenever they come down Foreman, and also come up Donald, and come straight across north up around there during the night from five cars to about ten or eleven an hour. Q. Now, have you watched or do you know what number or proportionate number of cars, if any, stop at the Handley home? A. Well, they go to the end of the street and up there where he is, but whether they go into there or not, the car stops, but where the people go, I don't know; and they come back. By the Court: The cars do what? A. They go up and stop there by his house, but I am not home in the daytime. I am only there of nights, and I often watch the cars go up

there, and count them; but in the day time, I don't know, but only of a night; I don't know where the people go; I see the cars go up there and come back. I get home about 7 o'clock, and we go to bed about 10 or 10:30. I would say from the time I get home until I go to bed, the number of cars that go up there near the defendant's home is about five cars an hour. Q. Are you acquainted with what is the general reputation of what is known as Frank Handley's home, located on lots 1 to 8 inclusive, of block 5, Riley's addition to the city of El Reno, as to being or not being a place where liquor is stored and kept, and for the purpose of sale, barter, and otherwise furnishing the same? By Mr. Harrod: We object to that as being irrelevant, incompetent, and immaterial, and prejudicial, and no predicate having been laid."

This was overruled, and exception taken.

"Q. You may answer that question by yes or no. A. Now, the question is what? Q. You understand, Mr. Palmer, that reputation is what people say about a person? A. And you want to know what kind of reputation, is that the question? Q. I want to know whether you know what the reputation of that place is? A. Now, from what I heard? Q. Well, from what you heard or have you heard before what it is? A. Yes. By Mr. Harrod: We object to that; he has answered the question. By the Court: Overruled. By Mr. Harrod: Exception. Q. Would you say that, is that reputation good or bad, as to being a place where liquor is kept, and stored, and for the purpose of sale, and barter, and otherwise disposing of? A. Bad, I would say."

Cross-examination:

"I live about two blocks south of Mr. Handley. These streets are not laid off in blocks. They are not laid out. Foreman is the only street. I am south of Second street; south of his place. I would think about three hundred yards from Handley's place. I live near the corner, and there is a house between me and the corner. I live on the west side of the street facing west. I can stay in my house and see up on their porch. There are about three houses

north of me between my house and Mr. Handley's. I have never been over at that Foreman Street. I have been over there one time, but I don't know how many houses. I don't know how many houses there are in between me and Mr. Handley. The street I have been talking about is the street west of the schoolhouse. I live next to Foreman. Q. Well, that's the first street south of his house opened up, isn't it? A. I don't know whether this street is opened up, that's the one I don't know; yes, you see a big road in here down over there, but I don't know whether or not I have ever been on that road. Q. Now the road to the schoolhouse? A. The road to the schoolhouse and De Laughter lives on the corner. Q. Now, what time do you go to work of a morning? A. Six, between 6 and 7. Q. Do you see any cars going up there of a morning? A. In the morning, I have never looked up that way. Q. You go by your house, don't you? A. Yes, but I go to the back, only I just go along here. Q. What time do you get home in the evening about? A. I get home around about 7. Q. Now, last July, did you stay out there every evening and watch these cars? A. I often hold my cow in the section line for a couple of hours, and that's where I see it. Q. Well, you don't see it, then, sitting on your porch? A. No, I never sit on my porch. Q. It's just the few times that you have been out grazing your cow that you have seen this? A. Yes, sir. I didn't see anybody buy any whisky up there; nor did I ever see anybody drink any whisky up there. I have not seen any drinking up there. I have seen them near my place, but not up there. I haven't been to the defendant's place. I saw the cars go up there. Q. Did you ever see anybody get out of a car that was drunk, in your judgment? A. I couldn't tell; I don't watch that; I have never seen them get out. Q. Well, you have paid particular attention to what was going on, haven't you? A. Yes, sir. Q. Well, you counted the number of cars that go up there and stop? A. Yes. Q. And while you were looking? A. Yes, I have counted the cars; and I have counted as high as 12 in an hour while I was with the cow, but just what they did up there, I couldn't tell you. Q. Well, did you ever see any packages delivered to the house? A. No, sir. Q. Did

you ever see anybody get out of the cars, and stagger into that house? A. No. Q. Did you ever see anybody come out of the house, and stagger out to the car, and get in it? A. No, sir. Q. Did you ever see anybody get out of one of those cars that drove up there? A. Well, I have seen them get out, but it's difficult to tell when you are back a distance of two blocks, and couldn't tell you what a person was doing, whether he gets out or whether he don't. Q. Now, Mr. Handley has a large family, hasn't he? A. I don't know how many children he has. Q. Well, you have seen a number of children there, haven't you? A. I have seen one of his boys, and there is one small girl that goes to school where mine does. Q. Do you know what he does? A. No, sir. Q. What he does for a living? A. No, sir. Q. Did you ever make any complaint to the sheriff of this county about what you are now telling this jury? A. No, sir. Q. And there is nothing that you saw out there that aroused your suspicion to the extent that you would have used your telephone and called Mr. Harrison, the sheriff of this county, and told him about it up there? A. Nothing that I could prove. Q. Well, did you ever call Mr. Harrison, and tell him what you thought? A. No, sir. Q. And ask him to send officers out there to investigate it? A. No, sir. Q. Was there ever any loud talking up there? A. Not that I know of; I don't know. Q. Well, I mean that you heard? A. No, sir."

Redirect examination: "I saw one drunk man come from the north one night. Mr. Handley's house is from the north."

Re-cross-examination by Mr. Harrod:

"Q. You have lived there about 18 months, and saw one man drunk coming from the north, didn't you? A. That's what I saw."

Mrs. Sadie Story, testifying for the state, stated:

"My name is Sadie Story. I live at 811 East Clark, El Reno. I know where lots 1 to 8 inclusive, block 5 of Riley's addition to the city of El Reno, is located. I

know where Mr. Handley lives. I live, I guess, it is about two blocks, and just across. I live on Clark and Foster streets; and he lives on the next street, two blocks from me on Donald avenue. It is perfectly clear between my home and Mr. Handley's. Nothing to obstruct the view. I have lived there eighteen years. For quite awhile people used to go to Mr. Handley's fast; and there would be lots of people go by; but the last week or two I have not seen so many cars. The condition down there in the year past until the 12th day of August, 1937, there was lots of drinking going on down there, but I don't know what for. I don't know what business the defendant is in. All I know is hearsay. I am acquainted with the general reputation of that place. Q. Are you acquainted with the general reputation of what is known as Frank Handley's home on lots 1 to 8, inclusive, block 5 in Riley's addition to the city of El Reno, as to it being or not being a place where intoxicating liquors are sold, kept, and stored? A. I just heard it. Mr. Harrod objected to that as being incompetent, irrelevant, and immaterial, and no predicate laid. By the Court: Overruled. By Mr. Harrod: Exception. A. Yes, sir. That reputation, I call it bad."

The witness continued:

"I thought it bad; so many people go there; I didn't think of looking or I didn't see what was going on or I don't know. I never saw any whisky up there. I have seen parties get out of the car and go in, get a package and come back, and get in the car; but I don't know what was in the package. I couldn't tell you when that was. It was very often. I would see it, but I would not see what was in the car. This spring and last summer and last winter, and all the time nearly; it hasn't been long that I have not seen anybody come there. I never saw any one get out of the car and staggering around. I never heard any loud talking going on over there, except I saw some cars pass our house two or three nights, and they were using profane language, but I don't know whether they had been there or not. I couldn't see anything. I didn't see the cars go up there to Mr. Handley's, but there were drunk people there, because they stopped in front of our house, and

asked where Mr. Handley lived, and I wouldn't tell them. They were drunk. Q. They didn't get the whisky from the defendant? A. No. Q. They only had it? A. They only had it, and they inquired about where Mr. Handley lived; and I said I didn't know, but that was all I storied."

The witness continued:

"They were drinking, and I didn't think they needed to go on. I didn't stay up and watch these folks."

Mrs. O. R. Ferguson testified that she lived at 1106 East Clark.

"I know where lots 1 to 8 inclusive, block 5 of Riley's addition are located in the city of El Reno. That is where Frank Handley resides. He has lived there, I believe, about two years. I have lived where I live about eight years. I can see the home of Frank Handley from where I live. Prior to the 12th day of August, 1937, I knew to what extent people would come and go at Mr. Handley's home. There was a whole lot of people who came and went there. I really don't know much, but I know there is quite a bit of traffic that goes down there and stops and turns around and stays there. I don't know how long they usually stay. I have never made any estimate as to the number. I just couldn't say, but 40 or 50 I would imagine in 24 hours. I sure sleep at night. I know that traffic goes up there at night, because that usually wakes me up regardless of the time of night it is. Lights shine in my bedroom. They do that, and that wakes me up. That is quite frequent. I know what the reputation is up there. Q. Is that reputation good or bad? A. Well, it is bad. By Mr. Harrod: We object to that as being incompetent, irrelevant, and immaterial, and no predicate having been laid. By the Court: Overruled. By Mr. Harrod: Exception. Q. I didn't get that answer. A. It is bad."

Cross-examination by Mr. Harrod:

"Q. Lady, you say you see all the cars that go up there, go next to your home? A. Yes, sir. I see the cars pass up that road until two or three o'clock in the morning. I don't go to sleep until 2 or 3 o'clock in the morning.

I can't say that I ever saw any drunks at Mr. Handley's place; nor did I ever hear any loud talking up there. My place is about a half block from Mr. Handley. Mr. Handley has, I think, three cars. There are cars that go up to Mr. Handley's and stop. I wouldn't see the cars going in. I would be asleep. When they started back by my house the lights would wake me up. I couldn't say whose cars they were."

Redirect examination:

"I don't know what business Mr. Handley is in. They don't have any store building that I know of, but I have never been there."

Mr. Carl Whitlock was called, and stated that his post office was El Reno, Okla. "I know Mr. Frank Handley."

The county attorney asked him if he was acquainted with the general reputation of the place where Mr. Handley lived, which is located on lots 1 to 8, inclusive, block 5 of Riley's addition in the city of El Reno.

"A. Do you mean as to the general reputation of the place? Q. The general reputation, yes, sir? A. To a certain extent I am. Q. Is that reputation good or bad? A. It is bad."

Mr. S. S. De Laughter stated:

"My name is S. S. De Laughter. I live on the corner of Foreman and Donald. I believe it is south on Foreman street. Foreman street runs right straight through that addition. Q. How far is that from your home? A. That is two blocks from Mr. Handley's."

The witness continued:

"I have sat on my porch and seen them run there day and night. I have seen cars go down there at 4 or 5 o'clock in the morning; and I have seen them go down there when no one would be there; and they would go down there and stay a few minutes, and then come back. I am not working

now. Prior to August 12, 1937, and as near as I can say, I have seen cars running all night long, day and night; and sometimes there were five cars down there; and sometimes there were two or three that would go down there, and stop down there after dark. By Mr. Roberson: Q. Now, go ahead and finish your answer. A. Well, now, lots of times, you see cars try to pass there. Well, there was some over there from Foreman down, and I covered it yesterday so as not to be mistaken; and it is twelve and thirteen feet wide, and there is a ditch on both sides. Well, whenever it rains, that ditch will fill up with water, and I have seen two little girls come over there and cross, and they had to get out of the car in order to keep from getting wet, and two of them went home, and I have seen several come there, his children come there. Q. Do you mean by that, that the traffic is so fast or so swift and so much of it, perhaps, that it was prevented to go through there? A. Well, when two cars pass there, there isn't room on the road for anybody; they have got to get off and then, this gate, there is a ditch there, and there is no way that the water will run away from there, and it is just laying there soaking until it goes into the ground."

The witness continued: "As near as I can tell they go to Mr. Handley's day and night."

The witness was asked about the defendant's reputation, and didn't seem to know what the county attorney meant; but finally it was explained to him, and he said:

"Yes, sir, I think lots of them spoke about it" An objection was made to that. The witness finally answered: "I didn't think it was safe for any one to drive down that narrow road. Q. I didn't ask you that. Do you know what the reputation of the place is, as to being a place where liquor can be had and purchased or sold? A. Well, I never thought; no, I don't know. I never talked to any one that has been there."

Mrs. Nancy Jane De Laughter stated that she lived at 250 North Donald, and that Mr. Handley lived about two blocks south of her.

"I am not acquainted with Mr. Handley's home. I have seen it. I can see it from my house. I know I can see the traffic up there. There is a lot of traffic up there. Sometimes three, four, or five cars go down and turn around, and come back. Q. Well, they just go over there and turn around and leave or stay there? A. Well, they stay. Q. Of course, stop? A. Yes, stop. By Mr. Harrod: Objected to as being leading and suggestive. By the Court: Overruled. Q. You see them stop? A. Yes, they stop."

The witness continued:

"It is every day that I see them, and sometimes at night. I know the general reputation."

Mr. Harrod objected to that; and the court overruled the objection, and exception was taken.

"Q. Is that reputation good or bad? A. Well, I suppose it is bad, I don't know. Q. Well, is it bad? A. Yes, sir."

Cross-examination:

"I never saw any one drunk down there at Mr. Handley's. I never heard any loud talking at Mr. Handley's. I heard some out in front of our place. I never saw any drunks down there. I never saw any whisky down there."

Mr. N. W. Fariss was recalled by Mr. Roberson, and stated:

"I know where lots 1 to 8, inclusive, block 5 of Riley's addition in El Reno is located. During the last year or two, and prior to the 12th day of August, 1937, there was a great deal of traffic going down towards Mr. Handley's house. I have observed as many as a dozen cars in an hour's time. They went up to Mr. Handley's residence and stayed a few moments, turned around, and came out. Q. Are you acquainted with the reputation of that place? A. I am. Q. All right, is that reputation good or bad? A. Bad. Mr. Hahn had a search warrant on the 12th day of August, 1937, when we went out there to search their place. The sheriff was not along. I believe I swore to the

complaint. Mr. Harrison, the sheriff, did not go with us that day, and did not serve the search warrant. I have observed as many as a dozen cars an hour going to Mr. Handley's place. Q. And that was while you was an officer of the law in this county, isn't it? A. Yes, sir. Q. You had a free hand in raiding the place any time you wanted to, didn't you? A. Well, pretty much so; yes sir. Q. Now then, did you, after staying there and watching these cars go up there, did you go and raid it? A. I have raided the place at various times, after such observations. Q. And wouldn't find anything? A. Sometimes not find anything, and other times, I have found whisky. Q. At the time that large quantity of whisky was found there, that you testified about this morning or this afternoon about that happening about a year ago, did you watch that place that day before you made that raid? A. I did not. Q. Now, then, will you tell us of a single instance where you sat out there and watched the place for an hour and saw a great number of cars go in and out there, and you raided it and found any whisky? A. No, I don't recall any such time. Q. You say, Mr. Hahn served that search warrant? A. I am quite sure that he did. Q. And you do know who he served it on? A. No, I couldn't say, either the mother in the home or one of the oldest girls; they were both right there together when we went in. Q. Did you see him serve it? A. I was right behind him. Q. Well, are you able to tell the jury which one he served it on? A. I am not."

Exhibit "7" was offered by the state, which was the search warrant claimed to have been used by the officers on August 12, 1937, in searching the defendant's home.

On cross-examination the witness was examined by Mr. Roberson. The witness said he was sheriff of Canadian county, and that he had deputies and jailors under him, and that they were authorized to make returns upon warrants. "I know that an officer got a search warrant on August 12, 1937. W. N. Fariss was my deputy on that date, and so was Dan Hahn and Roy Pool."

Frank Handley was called in his own behalf, and stated that his name was Frank Handley.

"I am the defendant in this case. I was living in El Reno on the 12th day of August, 1937; my home was in El Reno. I had no other home. I have seven children and a wife, and some grandbabies. I was not at home on the 12th day of August, 1937, when the officers came to my house, and made a search. I was never served with any search warrant; nor did I ever see a search warrant that was served at my house when the officers searched it on the 12th of August, 1937."

On cross-examination he restated that he had several children and a wife.

"Their names were Clara and Irene; Clara is 25 years of age. Irene is 16. They were living with me at that time. Also, my wife was living with me."

Mr. Harrod moved to suppress the evidence in this case and to strike all of the testimony of officers W. N. Fariss, Dan Hahn, and Roy Pool as to any intoxicating liquor that may have been found in the home of the defendant on August 12, 1937, for the reason the officers were not armed with a valid search warrant.

"And second, ——" (Interrupted). By the Court: Where is John Harrison? Bring him back here. By Mr. Harrod (continuing): And second, for the reason that the purported search warrant that the officers had was not executed and returned as provided by law. By the Court: I want to ask Mr. Harrison a question." Mr. John Harrison, being recalled as a witness on behalf of the defendant herein, in the proceedings had before the court and in the absence of the jury, and having been heretofore duly sworn upon his oath and testified heretofore, now testified as follows: "By the Court: Q. Do you know whose handwriting that is, where it is signed 'John Harrison' on that return? A. It isn't mine, Judge. Q. Well, do you know whose it is? A. It is Mr. Fariss'. By Mr. Roberson: Q. W. N. Fariss? A. Yes, sir. Q. Depu-

ty sheriff? A. Yes, sir. By the Court: Overruled. By Mr. Harrod: Well, I haven't it all in there, Judge. By the Court: Oh, pardon me. By Mr. Harrod: The proof shows, conclusively, that W. N. Fariss did not execute the search warrant that the officers had; that the officer Dan Hahn executed the search warrant; and there has never been any return showing that the search warrant that the officer Dan Hahn executed was ever served and returned as provided by law. By the Court: Overruled. By Mr. Harrod: Exception."

The defendant demurred to the evidence introduced on the part of the state for the reason that the same was wholly insufficient to sustain the charge of maintaining and operating a public nuisance, as alleged in the information, and moved the court to instruct the jury to return a verdict of not guilty.

"By the Court: Overruled. By Mr. Harrod. Exception. By Mr. Roberson: Dan Hahn, come around here."

Dan Hahn stated that he was sworn yesterday and had testified.

"I was in company with Newt Fariss and Roy Pool in making a search of the premises of the defendant Handley. I personally delivered the search warrant to one member of the Handley family. The first party I saw. Q. Do you know whose handwriting that is? A. No, I don't. Q. Is that your handwriting? A. No, sir."

The county attorney asked permission to correct the return to show the facts, and asked that the witness Dan Hahn be permitted to make a return and to sign it in compliance with the evidence introduced for the purpose of correcting the record, showing the service that was actually made, and for whom it was made.

This was objected to by the defendant.

"By the Court: In the first place, the return don't have a thing in the world to do with the validity of the search."

On cross-examination in answer to a question, the witness stated:

"I believe it was Irene. One of the girls; I know them when I see them, but I am unable to tell what their names are. I said yesterday I believed it was Irene. I wasn't sure. It was not Mrs. Handley. I am able to state now that the copy of the search warrant I served on the daughter of Mr. Handley is a true and correct copy of the Defendant's Exhibit '7'. This is supposed to be an original, and I served a copy of that. I did not make any return on the warrant I served. Usually on a search, if you have to fool around to serve it on the head of the family, then they will destroy the liquor on each occasion. By the Court: Well, that's got nothing to do with it."

The defendant renewed his motion to suppress the evidence, which was overruled, and exceptions saved.

Charley (Choc) Handley was called as a witness on behalf of the defendant, and stated:

"My name is Charley Handley. I am a son of the defendant Frank Handley. I am 19 years of age and reside in El Reno in Canadian county, Oklahoma. I was living at home with my father and mother on August 12, 1937. The night before the 12th or on the 11th, Don Emerick and I went over to Oklahoma City to a dance. Don Emerick is standing just outside. He lives down in town. I don't know how old he is. We went over there to attend a dance. I saw the bottles of gin that were in here yesterday as evidence. They belong to me and Don Emerick. We bought them in Oklahoma City. I took them home, and put them on the washing machine, and put some of the laundry over them. My father, Frank Handley, did not know that the gin was at the house. Don Emerick and I and some more kids intended to drink it that night. We were going to another party. I did not tell my mother that we had the gin, and she did not know it was in the house. I came home the 12th of August, 1937, just before the officers left. I pled guilty to the possession of whisky once. This is my gin. I knew before the officers left they

had been out there searching. I only spoke to them. I didn't talk to them, just spoke. My mother didn't know it was there; and she told Mr. Fariss she didn't believe it was in there. She told them there was not; and I didn't say anything; and after they took Dad to jail, I came up there to the sheriff's office, and told him that it wasn't Dad's. I told Mr. Harrison that wasn't Dad's and so, I said, it was mine, and if they would turn him loose, I would go to jail myself, because he didn't know anything about it."

On cross-examination the witness stated:

"I am 19 years old, and I went to Oklahoma City the night before the 12th. I don't know who the party was we bought the gin from. I am not the conveyor of whisky from place to place. I have had something to do with whisky, but it wasn't now. I am not having anything to do with it now. I think I have been convicted three times for violation of the liquor laws. About three times, and for being drunk twice. No, just once for being drunk. I was not at home when the officers came that day. I came in just about the time they got done their raiding. I did not tell the officers at the time I came in the house that it was my gin. They took the defendant to jail; and I got in the car and went to them about it. The reason I didn't tell the officers while they were at the house that it was my liquor, I didn't think of it at that time. After they took Dad away, I went and told them it was my gin. Q. What do you do for a living? A. I am not doing anything right now. It has been about two and a half years since I went to school. I worked a little bit since that time. Q. And your business is that of selling and transporting, and the liquor business, isn't it, Choc? A. Why, sure, it's the liquor business. Q. And that has been your business, hasn't it, and all the time, hasn't it? A. No, it has not. I did not plead guilty to a violation of the liquor laws while in school; nor was I in the liquor business before I quit school. I have not been at it ever since I quit school. I have been living at home. Dad makes my living. Q. Dad made it; all right, what is your dad's business? A. Well, he has sold it. Oh, I said that Dad had sold a little liquor.

He does not farm at this time. He is a barber by trade. He has not worked at the barber trade since we moved up here. We have been up here about three and a half years."

Don Emerick was called on behalf of the defendant, and testified as follows:

"My name is Don Emerick. I am 20 years of age, and my home is here in El Reno. I live with my parents. I remember being in the city with Choc about the 12th of August, 1937. We left here and went to Spring Lake, and stayed there until about 12 o'clock, and went to Happy Time, and out to the Silver Dollar. We got out there and danced and ran into a couple of girls. Then we went back to the cafe, and stayed around there. We went to the Recreation Camp; and then went out to some more of these night clubs. Along about 6 o'clock, or something like that, we went to the Goody-Goody and drank a cup of coffee. We decided we wanted something to drink. We called a fellow, and he said he thought he could get us something, and asked how many we wanted. We told him about four pints. He went to the telephone and called. We gave him $1.25 a pint for it. After we got it, we fooled around town until a little after eight o'clock. We went to Billie's No. 2 and looked at some stuff. Around eight or eight-thirty we started for home, and stopped in Yukon, and got another cup of coffee, and come on back to El Reno. He left me and went on home. He had the four pints of gin. I was there when they had the gin at the trial yesterday. It is the gin that we purchased in Oklahoma City the morning of the 12th. We were going to use that gin on a private party that night."

Cross-examination:

"We got four pints. We didn't open either pint. We went over there that night to Oklahoma City to a dance. I don't know how many places we went to. We went to the Green Lantern, the Goody-Goody, and Happy Time. I don't remember all of them. We stayed all night in Oklahoma City. At two o'clock we were over at Happy Time or on the way to the Silver Dollar. We stayed out to the Silver Dollar until around four o'clock. We drank 3.2. We

were going to a party the next night, and got those four pints of gin to drink. We got more of the liquor than gin. I am working down at the Cities Service. I have been working ever since the first of September. I wasn't doing anything in August. I was in California up until the 12th day of July, and I came back here. I have not been convicted for the violation of the law. I have never been arrested for violation of the law."

Redirect examination: "Nobody accused me of drinking or carousing."

Fourteen errors have been assigned by the defendant alleged to have been committed in the trial of his case. The fourteenth assignment of the defendant is that the trial court erred in overruling defendant's motion for a new trial. Included in this motion for a new trial are all of the errors assigned; and they will be discussed together, as the question raised by the defendant appears in the record, and is material to the rights of the defendant.

Our statutes define a nuisance as follows:

"A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

"First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or,

"Second. Offends decency; or,

"Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or,

"Fourth. In any way renders other persons insecure in life, or in the use of property." 50 Okla. St. Ann. § 1.

Section 2616, O. S. 1931, 37 Okla. St. Ann. sec. 73, in part is as follows:

"All places where any spirituous, vinous, fermented or malt liquors, or any imitation thereof, or substitute therefor; or any malt liquors or compounds of any kind or de-

scription whatsoever, whether medicated or not, which contains as much as one-half of one per centum of alcohol, measured by volume, and which is capable of being used as a beverage, except preparations compounded by any licensed pharmacist, the sale of which would not subject him to the payment of the special tax required by the laws of the United States; is manufactured, sold, bartered, given away or otherwise furnished in violation of any provision of this act; and all places where any such liquor is kept or possessed by any person in violation of any provision of this act; and all places where persons congregate or resort for the purpose of drinking any such liquor, are hereby declared to be public nuisances. * * *"

Section 2616, O. S. 1931, 37 Okla. St. Ann. § 73, supra, was amended by the Legislature in the Session Laws of 1933, chapter 153, House Bill No. 647, page 338, 37 Okla. St. Ann. § 151, by making any beverage containing more than 3.2 per cent alcohol by weight intoxicating, and declaring that other beverages are declared to be nonintoxicating.

The defendant in this case did not dispute the fact that he had previously been convicted of the possession or selling of intoxicating liquors; but the record shows that it was sometime prior to the 12th of August, 1937, that the defendant had been charged with violation of any of the prohibition laws of the state.

The charge upon which the defendant was tried was based upon the fact that on August 12, 1937, officers went to his home, and on a washing machine in one of the small rooms of the house they found four pints of gin, wrapped in paper and tied with a string. The defendant denied that he knew anything about this gin being in his home. His wife knew nothing about it. His son, Charles, testified that he had bought the gin in Oklahoma City the morning of the 12th, and that he was accompanied by Don Emerick,

who was with him when he bought it. Emerick testified to the same facts as did Charles Handley, that they bought this gin in Oklahoma City on the morning of the 12th of August, 1937, and that they intended to use it that night when they were going to attend a party somewhere in the neighborhood of El Reno.

The officers, Fariss, Hahn, and Pool, went out to make the search; and it was sometime before they could testify as to who served a copy of the search warrant upon the minor daughter of the defendant. The wife of the defendant was at home at the time. The defendant was not at home. The return was made on the search warrant with the name of the sheriff signed to it. After some investigation and consulting together, they finally made up their minds that Deputy Hahn served the warrant on Irene Handley, a girl under age.

The question of service of the warrant was immaterial so far as the question of whether or not the defendant at the time the search was made was guilty of maintaining a public nuisance.

Defendant's former convictions were established only for the purpose of giving the district court jurisdiction of the offense charged against him. A great deal of evidence permitted to go to the jury over the objections of the defendant was not admissible, and the trial court should have excluded it.

A number of the defendant's neighbors were called, evidently for the purpose of trying to establish the fact that people resorted to the defendant's home for the purpose of buying and drinking whisky.

The defendant had a family of several children, two daughters, almost or grown, and lived out in a sparsely settled section of El Reno.

The sheriff of the county, in order to try to sustain a charge that people resorted to the defendant's home for the purpose of buying and drinking whisky, stated that he watched for about an hour, and there were quite a number of cars that went to the defendant's home, stopped awhile, and drove away. He did not see any one with whisky. He did not see any one at the defendant's home sell the parties any whisky, and did not see any one come away from the defendant's home intoxicated; and the great surprise of it all is that the sheriff testified to having watched and seen so many cars go to the defendant's home within an hour, that he left the scene of the defendant's home, and did not go and file a charge against him for a violation of the law.

The sheriff admits that he had never had any direct complaint against the defendant during the spring and summer and up until the 12th of August, 1937. He said there had been some indirect statements made to him about it; but he knew nothing personally of what was going on at the defendant's home.

One other witness who lived within about two or three blocks of the defendant's home testified that about 24 cars went to the defendant's home one time within an hour; but when examined as to what he saw or what they did up there, he knew nothing about it. He saw no sign of intoxication, and he saw no one going in and buying anything; nor did he see them come out showing any evidence of intoxication.

The state did not offer any testimony tending to establish the fact that people resorted to the defendant's home for the purpose of buying or selling whisky and drinking the same. The only evidence offered was to the effect that several months prior to August 12, 1937, parties drove to the defendant's home, back and forth; but there

was no evidence of any noise, loud talking, or that parties were seen drinking on the premises, carrying whisky away from the premises. In other words, all the testimony offered by the state only tends to show that people drove back and forth to the defendant's home. But not one word of testimony is offered showing any violation of the law on or about August 12, 1937, by bartering, selling, giving away or otherwise furnishing to others intoxicating liquors.

The fact that the defendant had, prior to this time and about a year previous, been convicted of handling whisky is not evidence to sustain a charge of maintaining a nuisance on August 12, 1937.

All of the officers, who went to the defendant's home on August 12, 1937, and for some months prior thereto when they failed to find any whisky at the defendant's home or on his premises, admit that they did not find any empty bottles that seem to have contained whisky. They found no glasses such as ordinarily are used in drinking whisky; and that they did not see any one around the place, going to or coming from, showing evidence of intoxication.

The peculiar part about this entire record is that the state did not seem to rely upon or attempt to establish what took place or was taking place at the defendant's home just prior to and on the 12th day of August, 1937, which would tend to establish that the defendant was maintaining a nuisance there at his home.

The father could have no intention to sell, barter, give away or otherwise dispose of the four pints of gin, unless he had knowledge of the fact that they were in the home. The fact that the son, Charles, and Don Emerick brought the four pints of gin into the defendant's home,

as testified to by them, does not in itself make the father guilty of having possession of these four pints of gin with intent to sell, barter, give away, or otherwise furnish to others, and is not sufficient evidence to sustain a conviction of maintaining a public nuisance.

The statutory definition, sec. 2616, O. S. 1931, 37 Okla. St. Ann. § 73, supra, with reference to a nuisance defines what constitutes a nuisance under our statute where a place is operated for the purpose of bartering, selling, giving away or otherwise furnishing intoxicating drinks to others, and where persons congregate or resort for the purpose of drinking any such liquors.

There is no testimony in the record that shows that any of the parties claim to have been seen going to and away from the defendant's home or congregating there for the purpose of drinking whisky; nor do any of the witnesses say that the parties went there at the time alleged, on August 12, 1937, and bought whisky or other intoxicating drinks from the defendant or any member of his family at that time.

In Patterson v. State, 17 Okla. Cr. 495, 190 P. 271, 273, in the body of the opinion the court stated:

"Where there is evidence to support the verdict this court will not pass upon its weight or sufficiency in order to determine whether or not the defendant was guilty as charged. However, there must be evidence tending to support the essential allegations of the information. In this case there is no direct evidence tending to show possession of intoxicating liquor. The facts relied upon by the state to show possession are circumstantial. The defendant denied possession, and another person claimed ownership and possession of the liquors seized by the officers.

"Assuming that the evidence on the part of the state showed possession by the defendant of the liquors seized, there was no evidence tending to show that the defendant

intended to sell or dispose of the same as charged in the information, and the evidence wholly fails to show that persons had congregated and resorted to the defendant's place for the purpose of drinking such liquor."

The evidence in this case shows that the officers found four pints of gin in a small room on the washing machine, when the officers went there to search on August 12, 1937; and the undisputed proof is that the defendant in this case was not the owner of the gin and had no knowledge that it had been brought into his home.

There is no evidence tending to show that the defendant intended to sell or dispose of the gin as charged in the information; and the evidence wholly fails to show that persons had congregated and resorted to the defendant's place for the purpose of drinking such liquor on or about August 12, 1937.

Considering the testimony in this case and the rendering of a verdict of guilty by the jury, and the sentence imposed on the defendant of a fine of $1,000 and a term of three years in the state penitentiary, it discloses that bias and prejudice entered into the trial of this case and that the defendant did not have a fair and impartial trial, and that the conviction and sentence were not predicated and based on competent and relevant testimony.

Because the evidence is insufficient to sustain a conviction of maintaining a nuisance, the judgment of the trial court is reversed and the case is remanded.

DOYLE, P. J., and BAREFOOT, J., concur.